Keith **CARMICHAEL, et al.,**
**Plaintiffs–Appellants,**

v.

**UNITED TECHNOLOGIES CORP., et al., Defendants–Appellees.**

No. 86–2979.

United States Court of Appeals, Fifth Circuit.

Jan. 7, 1988.

---

Dana G. Kirk, Kirk & Carrigan, Houston, Tex., Anthony D'Amato, Chicago, Ill., for plaintiffs-appellants.

Travis C. Broesche, David C. Holmes, Houston, Tex., for United Technologies Corp., et al.

Joseph D. Cheavens, Baker & Botts, Houston, Tex., for Price Waterhouse.

Ralph Shain, Ronald E. Cook, Mayor, Day & Caldwell, Houston, Tex., for Daniel, et al.

Before BROWN, POLITZ and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Keith Carmichael, a citizen of Great Britain, sued the defendants in the Southern District of Texas under the somewhat obscure Alien Tort Statute[1] for his imprisonment and torture in Saudi Arabia. The district court dismissed. We affirm.

I

Carmichael is chairman and general manager of Sacem International, a Netherlands corporation with its principal place of business in Houston, Texas. In 1981, Sacem

---

1. The Alien Tort Statute states that: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (1976).

was hired to perform general contracting work in Saudi Arabia. Sacem was sponsored by Sigma Corporation, a Netherlands corporation owned and operated by the Saudi royal family. Apparently, under Saudi law, Sigma possessed the power and ability to revoke Carmichael's exit visa at any time during Sacem's operation in Saudi Arabia.[2]

In the fall of 1981, commercial disputes arose between Carmichael and the defendant corporations over whether Sacem owed money to the defendants. Carmichael learned that Sigma planned to revoke his exit visa and, apparently on the advice of his attorneys, he attempted to flee the country without his passport. Irrespective of whether the advice was good or bad, the plan did not work. He was arrested in the neighboring country of Qatar and returned to Saudi Arabia.

After Carmichael's arrest, a straightforward legal announcement appeared in Saudi newspapers, requesting all businesses with claims against Sacem to file them. Several corporations, including the defendants named on appeal, filed claims. Carmichael initially maintained that these claims were unsubstantiated by evidence of the alleged debt. Nevertheless, he was told by Saudi officials that he must either pay up or obtain releases from the claims in order to get out of jail.

And stay in jail he did. Although he languished there for more than two years, he was never formally charged or tried for any offense. According to Carmichael, and substantiated by reports from humanitarian groups, he was mistreated and tortured during this time. Meanwhile, he wrote letters to his creditors, among them the defendants, seeking releases from their claims, and in October 1983, two years after his arrest, mutual release forms were finally signed. Still, it was not until March 1984 that Carmichael was finally released from jail.

In March 1986 Carmichael filed this suit in the Southern District Court of Texas (Houston Division) against the defendants for false imprisonment and assault and battery. Carmichael alleges that the defendant corporations conspired with the Saudi government to have him jailed. He further alleges that, knowing of his incarceration and the type of treatment he was receiving, the defendants purposefully delayed giving their unilateral release of their claims in order to force him to sign mutual releases and covenants not to sue. For jurisdiction, Carmichael relies upon the Alien Tort Statute, which gives the United States district court original jurisdiction over tort suits brought by aliens for violations of the law of nations or treaty law of the United States.

In district court, the defendants responded with a motion to dismiss for lack of jurisdiction. The defendants filed affidavits that allege insufficient service, lack of subject matter jurisdiction under the Alien Tort Statute, lack of personal jurisdiction under the Texas Long-Arm Statute and a failure to state a claim because the defendants had no control over Carmichael's incarceration. Oddly, Carmichael did not file any responding affidavit, and the district court dismissed for insufficient service,

---

**2.** In oral argument, Carmichael claimed that the events and circumstances leading to his arrest were unknown, since the Saudi officials never brought formal charges, and no hearing was held on this issue by the district court. The facts presented here are supported, however, by Carmichael's complaint, those findings of the district court which are not contested, the uncontested affidavits of the defendants and Carmichael's statement in his brief on appeal that:

Mr. Carmichael will prove at trial that the Saudi authorities illegally confiscated his passport and informed him that if he did not pay the alleged debts he would be thrown into prison. His objection that the alleged creditors owed his company went unheeded. Under the circumstances, and on the advice of his attorneys, Mr. Carmichael decided to flee. In doing so, he was exercising his freedom to leave the country, a freedom that cannot be denied by a country merely by requiring an exit visa and then bootstrapping the failure to procure such a visa into a serious offense. Any person, whose passport is confiscated and who is then blackmailed under the threat of inhumane imprisonment into paying monies not owed, would have done the same.

lack of subject matter jurisdiction, and lack of personal jurisdiction.[3]

On appeal, Carmichael has dropped all defendants except United Technology Saudi Arabia ("UTSA"), United Technologies Corporation ("UTC," as parent of UTSA), Price Waterhouse, TMSI Arabia, Ltd. ("TMSI"), and Daniel, Mann, Johnson & Mendenhall ("DMJM" as parent of TMSI).

We find no error in the district court's holding on the first two issues with respect to all defendants except Price Waterhouse. With respect to Price Waterhouse, however, we affirm the district court's dismissal for lack of subject matter jurisdiction.

## II

### A.

■ The district court's holding of insufficient service is correct for all defendant's except Price Waterhouse. Because the Alien Tort Statute is silent as to method of service, parties must rely upon local rules. In this instance, therefore, the Texas Long-Arm Statute, section 17.044 Tex.Civ.Prac. & Rem., applies.

■ Carmichael served the Texas secretary of state as agent for UTC, UTSA, DMJM and TMSI. Service for Price Waterhouse was made upon their resident partner in Houston. The district court held that service was insufficient for all defendants.[4]

With the exception of Price Waterhouse, none of the businesses mentioned has agents or officers in Texas or does business in Texas, nor did the cause of action arise from business dealings in Texas. Service on the secretary of state was therefore ineffective under the Texas Long-Arm Statute. We find no error in the trial court's ruling based upon these facts as they apply to UTC, UTSA, DMJM and

TMSI. Price Waterhouse is a partnership doing business in Texas, and service to its registered agent was sufficient against it under Tex.Civ.Prac. & Rem. § 17.043. We hold that the court's ruling was erroneous as to Price Waterhouse. The suit against Price Waterhouse, however, was properly dismissed on other grounds, discussed below.

### B.

■ The district court, in its dismissal, found that Price Waterhouse is the only defendant doing business in the State of Texas. Carmichael argues, however, that UTC and DMJM, both American corporations, are parent companies for UTSA and TMSI, respectively. Carmichael contends that the court does have personal jurisdiction, therefore, under the "parent/subsidiary rule." We find no merit in this argument. First, Carmichael has adduced no evidence to counter the defendants' affidavits that state that the Saudi Arabian corporations are unrelated to their American counterparts. Even assuming, however, that UTC and DMJM are alter egos of UTSA and TMSI, Carmichael makes no argument why these parent companies may be sued in Texas. There is no evidence in the record that these American corporations have sufficient contact with the State of Texas. We find no legal or factual basis upon which to overturn the district court's ruling here. Except for the complaint against Price Waterhouse, therefore, the district court lacked personal jurisdiction to hear this suit.

### C.

■ The issue of subject matter jurisdiction is the most difficult one brought in this case. Carmichael bases his jurisdictional claim on the Alien Tort Statute, which

---

3. In his motion for new trial, Carmichael complained that the district court had dismissed the complaint before he had filed his brief on the issue of jurisdiction in response to the motion to dismiss, for which, he contended, the parties had agreed to extend the filing date. This brief was submitted as a memorandum to support the motion for new trial, however, and was considered by the district court when it dismissed his motion for a new trial.

4. Apparently the district court believed that Price Waterhouse was served through the secretary of state as well. The record shows, however, that a Houston resident partner was served on May 29, 1986, which was sufficient service.

states: "The district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Carmichael, an alien, maintains that the torts alleged here violate the law of nations because the defendants aided and abetted official torture.

The question of defining "the law of nations" is a confusing one which is hotly debated, chiefly among academics. "Official torture" has been recognized as an actionable tort under the Alien Tort Statute in some jurisdictions and not in others. *Compare Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980), and *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Assuming the Supreme Court and Congress continue to be silent on the issue, this circuit may be called upon at some point to join sides in this debate. This case, however, does not require that we stand up and be counted.

This circuit, in *Cohen v. Hartman*, 634 F.2d 318 (5th Cir.1981), adopted the definition of "law of nations" first articulated in *Lopes v. Reederei Richard Schroder.*[5] In *Cohen* we held that: "The standards by which nations regulate their dealings with one another *inter se* constitute the 'law of nations.' These standards include the rules of conduct which govern the affairs of this nation, acting in its national capacity, in relationships with any other nation." *Cohen*, 634 F.2d 318, 319 (5th Cir.1981) (quoting *Valanga v. Metropolitan Life Ins. Co.*, 259 F.Supp. 324 (E.D.Pa.1966)).

In his complaint, Carmichael makes reference to at least ten separate declarations, treaties and conventions that prohibit torture.[6] Carmichael cites these documents for the proposition that torture is internationally abhorred, and, indeed, it is. We agree that one means of ascertaining the law of nations is "by consulting the work of jurists writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *United States v. Smith*, 18 U.S. (5 Wheat) 153, 160–61, 5 L.Ed. 57 (1820). The treaties cited by Carmichael lend support to the conclusion that a consensus has been reached, at least among the countries that purport to uphold those treaties, that official torture violates the standards by which nations regulate their dealings with one another.

We will assume, without deciding, that "official torture" by one country of the citizens of another country violates the law of nations. Clearly, among civilized nations, official torture violates basic customs and standards by which one nation expects its citizens to be treated when conducting non-political business or travel in a foreign country. Moreover, "official torture," that is torture by officials shown to be officially condoned, of one nation's citizens by another nation clearly may affect relationships between and among countries in their dealings *inter se*. It is only the extent to which official torture may affect those relationships that is subject to debate.

We will also only assume, because it is unnecessary to decide, that the Alien Tort Statute does confer subject matter jurisdiction over private parties who conspire in, or

---

5. "'A violation by one or more individuals of those standards, rules or custom (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or dealings inter se' is a violation of the law of nations." *Lopes*, 225 F.Supp. 292, 297 (E.D.Pa. 1963).

6. Specifically, Carmichael lists the following treaties, covenants and declarations:
   UN Universal Declaration of Human Rights (1948); Geneva Conventions (1949) Common Article 3; UN International Covenant on Civil and Political Rights (1966); UN Declaration on the Protection of All Persons From Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1975); American Convention on Human Rights (1969); European Convention for the Protection of Human Rights and Fundamental Freedoms (1950); African Charter on Human and Peoples' Rights (adopted 1981, and not yet in force); UN Standard Minimum Rules for the Treatment of Prisoners (1957); UN Code of Conduct for Law Enforcement Officials (1979); UN Principles of Medical Ethics (1982).

aid and abet, official acts of torture by one nation against the citizens of another nation. We nevertheless find that Carmichael's claim against Price Waterhouse was properly dismissed for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Carmichael has failed to demonstrate that a tort in violation of the law of nations was committed by Price Waterhouse. In short, the record in this case establishes that Price Waterhouse did not conspire in, or aid and abet, official acts of torture by Saudi Arabi against Carmichael.

Ordinarily, when a Rule 12(b)(1) jurisdictional challenge attacks the merits of the underlying claim, the proper procedure is to find jurisdiction and then treat the challenge on the merits as a motion for summary judgment. The Supreme Court has carved out a narrow exception to this rule, however, "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial or frivolous." *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). As we explained in *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981), this exception is "intended to allow jurisdiction dismissals only in cases where the federal claim is clearly immaterial or insubstantial ... the *Bell v. Hood* standard is met only where the plaintiff's claim has no plausible foundation or 'is clearly foreclosed by a prior Supreme Court decision.'" 645 F.2d at 416 (quoting *Bell v. Health–Mor, Inc.,* 549 F.2d 342 (5th Cir.1977)). This exception, though narrowly construed, is designed to address the situation here. It would be fruitless in this situation to allow the plaintiff to continue, even if we could find general subject matter jurisdiction, because there is no plausible foundation for his claim against Price Waterhouse.

Price Waterhouse introduced affidavits,[7] not contested by Carmichael, that show that Price Waterhouse played no part in the initial incarceration of Carmichael; indeed, Price Waterhouse did not even know that he had been incarcerated until some months after the fact had occurred.

According to their uncontested affidavit, Price Waterhouse personnel submitted a claim to Sacem on December 15, 1981, after several unsuccessful attempts to contact Carmichael. Although they admit witnessing the arrest of one of Carmichael's associates, apparently in connection with a contract dispute, Price Waterhouse personnel knew nothing about Mr. Carmichael's arrest until several months later. In January 1982, an announcement appeared in an English language newspaper that advised that Sacem was winding up its business activities in the kingdom of Saudi Arabi and that all creditors should submit written claims to Carmichael at a designated post office box within two weeks. Price Waterhouse submitted its claim to that address.

Carmichael did not respond until March 8, 1982, when he asked Price Waterhouse to withdraw its claim in order to help him gain his release. Price Waterhouse immediately withdrew one of its claims, which Carmichael contested, but did not release a second one, which Carmichael acknowledged owing. Carmichael wrote again on May 23, 1982, and in response Price Waterhouse proposed that it was willing to execute a full *mutual* release with respect to *all* claims. Carmichael was willing only to release Price Waterhouse from any suit arising in Saudi Arabia; in effect, he refused to release it from any liability relating to his incarceration. Negotiations continued, although they were apparently hampered for some period of time by the failure of Carmichael's attorney or the Saudi officials to forward Carmichael's mail. In any event, in October 1983, Carmichael had a change of heart and executed the mutual release, which was duly delivered to the Saudi authorities. Nevertheless, Carmichael remained in prison until March 1984, which was approximately five months after the executed mutual release had been delivered.

---

**7.** The use of affidavits in consideration of a Rule 12(b)(1) motion to dismiss for lack of jurisdiction is proper and, unlike a Rule 12(b)(6) motion, does not require notice to the plaintiffs or change the motion into a motion for summary judgment. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981).

On these uncontested facts, Carmichael simply cannot demonstrate any causal connection between Price Waterhouse's conduct and his prolonged imprisonment or torture. In this case, there is no evidence that Price Waterhouse was responsible, directly or indirectly, for Carmichael's initial incarceration. Second, Price Waterhouse owed no affirmative duty to Carmichael simply to release him from an obligation that he admitted owing. And finally, no evidence was adduced in the 12(b)(1) proceeding that Price Waterhouse in any way conspired with or aided and abetted in the act that we have assumed constituted the violation of international law, that is, the official torture of Carmichael.

Thus in the absence of any evidence that the only defendant over whom the district court had personal jurisdiction could be held accountable for the tort committed against an alien in violation of the law of nations, we affirm the district court's holding that it was without jurisdiction to hear the case and its dismissal of the complaint.

For the reasons stated above, the judgment of the district court is

AFFIRMED.