Jane DOE I, on behalf of herself and all others similarly situated,

and

Jane Doe II, on behalf of herself, as administratrix of the estate of her deceased mother, and on behalf of all others similarly situated, Plaintiffs,

v.

Radovan KARADZIC, Defendant.

S. K.*, on her own behalf and on behalf of her infant sons B. and O., Internationala Iniciative Zena Bosne I Hercegovine "Biser," and Zene Bosne I Hercegovine, Plaintiffs,

v.

Radovan KARADZIC, Defendant.

Nos. 93 Civ. 0878 (PKL), 93 Civ. 1163 (PKL).

United States District Court, S.D. New York.

Sept. 7, 1994.

---

* Editor's Note: Names changed to initials for purposes of publication.

Catharine A. MacKinnon, Legal Defense and Educ. Fund, New York City (Martha F. Davis, Deborah A. Ellis, and Anne L. Clark, of counsel), for plaintiffs S. K. et al.

Center for Constitutional Rights, New York City (Beth Stephens, Matthew J. Chachere, Jennifer Green, Peter Weiss, Michael Ratner, Jose Luis Morin, Jules Lobel, Raymond H. Brescia, of counsel), Intern. Women's Human Rights Clinic, CUNY Law School, Flushing, NY (Rhonda Copelon, Celina Romany, of counsel), and International League for Human Rights, New York City (Judith Levin, of counsel), for plaintiffs Jane Doe I, et al.

Ramsey Clark and Lawrence W. Schilling, New York City, for defendant.

Patton, Boggs & Blow (Deborah Lodge, Jeanine Poltronieri, of counsel); International Human Rights Law Group (Steven M. Schneebaum, Janelle M. Diller, of counsel), Washington, DC, Debevoise & Plimpton (Donald F. Donovan, Barton Legum, Charles E. Joseph, Natalie R. Williams, of counsel); and Human Rights Watch (Kenneth Roth, Julie Mertus, and Ellen Lutz, of counsel), New York City, amici curiae.

## OPINION AND ORDER

LEISURE, District Judge:

These two related actions, *Doe et al. v. Karadzic*, 93 Civ. 0878 (PKL) and *K. et al. v. Karadzic*, 93 Civ. 1163 (PKL), have been brought before this Court pursuant to: the Alien Tort Claim Act, 28 U.S.C. § 1350 (1948); the Torture Victim Protection Act, Pub.L. No. 102–256, 106 Stat. 73 (1992) also codified at 28 U.S.C. § 1350; federal question jurisdiction, 28 U.S.C. § 1331; and the principles of supplemental jurisdiction, 28 U.S.C. § 1367.

Jane Doe I and Jane Doe II, on behalf of themselves and the members of their respective classes (collectively the "Doe Plaintiffs"), seek compensatory and punitive damages for acts of rape and other human rights violations committed by forces under the command and control of defendant Radovan Karadzic. Complaint *Jane Doe I and Jane Doe II v. Radovan Karadzic*, 93 Civ. 0878 (PKL), filed February 11, 1993, ("Doe Complaint") at ¶¶ 1, 6. Defendant Karadzic is the leader of the Bosnian–Serb military faction, which is fighting against the government of Bosnia–Herzegovina, *id.* at 6, and is also the self-proclaimed president of the unrecognized Bosnian–Serb entity. Doe Memorandum in Opposition to Defendant's Motion to Dismiss ("Doe Mem.") at 4; Doe Complaint at ¶ 15.

Plaintiffs in the related action, *K. et al. v. Karadzic* ("K. Plaintiffs"), seek injunctive relief and compensatory and punitive damages for personal injuries suffered as a result of *inter alia*, genocidal acts, torture, extrajudicial killing, and other violations of the law of nations. Complaint *S. K. et al. v. Radovan Karadzic*, 93 Civ. 1163 (PKL), filed March 2, 1993, ("K. Complaint") at ¶ 1. Doe Plaintiffs

and K. Plaintiffs (collectively the "plaintiffs") claim that they and others similarly situated are the victims of a genocidal campaign designed, authorized and directed by Karadzic.

Defendant Karadzic now moves pursuant to Fed.R.Civ.P. 12(b)(1), (2), (4), (5), and (6), for an order dismissing plaintiffs' actions on the following grounds: lack of subject matter jurisdiction, lack of personal jurisdiction, insufficiency of service of process, and nonjusticiability. For the reasons set forth below, defendant's motion to dismiss for lack of subject matter jurisdiction is granted and the actions are hereby dismissed.[1]

## BACKGROUND

On February 29, 1992, the Croats and Muslims of Bosnia–Herzegovina declared independence from Yugoslavia by popular referendum. Serbs living within Bosnia–Herzegovina boycotted the referendum and declared their own independence from the new nation, claiming a part of its territory for their own.[2] This Bosnian–Serb entity has not been formally recognized internationally, nor has it been recognized by the United Nations. Doe Mem. at 4, n. 3; Doe Complaint at ¶ 15.[3] The conflict between the Serbs and Muslims of Bosnia–Herzegovina escalated towards a state of civil war between the several ethnic factions within Bosnia–Herzegovina. The instant related actions arise out of acts allegedly engaged in by members of the forces under the command of defendant, and conducted in furtherance of defendant's attempt to gain power and control in Bosnia–Herzegovina. Doe Mem. at 4–5; K. Memorandum Submitted in Opposition to Defendant's Motion ("K. Mem.") at 2.

On February 11, 1993, Doe Plaintiffs filed their class action complaint, seeking redress on behalf of all women and men who were victims of the following torts inflicted by Bosnian–Serb military forces under the command of defendant: genocide, war crimes,[4] summary execution, wrongful death, torture, cruel, inhuman or degrading treatment, assault and battery, rape and intentional infliction of emotional harm. The class includes many thousands of people who have been subject to human rights abuses. Doe Complaint at ¶¶ 10–11. Doe plaintiffs alleged that Bosnian–Serb forces have systematically employed brutal violence against Bosnian Muslims. These abuses are collectively referred to as "ethnic cleansing." *Id.* at ¶ 17.

K. Plaintiffs also allege that defendant Karadzic designed, ordered, implemented, and directed a campaign of "ethnic cleansing." K. Complaint at ¶ 14. K. Plaintiffs allege that this campaign included, *inter alia,* massacres, selective murders, pillage, forced detention, and forced evacuations. Specifically, K. herself alleges that she witnessed the murder of her son, the burning of her home, and that she was repeatedly raped. K.

1. In a Memorandum Order, dated September 23, 1993, this Court granted defendant an additional week in which to submit his reply papers. In that Order, defendant was admonished not to raise issues for the first time in his reply, and that such issues would be treated as a nullity. In his reply, Defendant submitted the affidavit of Agent Deibler ("Deibler Affidavit"). In turn, Doe Plaintiffs sought leave to file a sur-reply in order to address arguments contained in defendant's reply papers, specifically those contained in Deibler's Affidavit. Deibler's Affidavit primarily addresses the adequacy of service on defendant, an issue that was previously raised in defendant's motion, yet the affidavit presents additional facts. Furthermore, Deibler's affidavit raises for the first time the issue of fund raising. In order to allow this Court more fully to address the issues raised in the instant motion, this Court herein, grants Doe Plaintiffs leave to file the aforementioned sur-reply, previously submitted to the Court. Accordingly, in addressing the arguments raised by the instant motion, the Court has considered defendant's reply papers in their entirety, as well as the papers submitted by plaintiffs in their sur-reply, including the State Department command post logs submitted to the Court on October 26, 1993.

2. *See* Chuck Sudetic, *Turnout in Bosnia Signals Independence,* N.Y. Times, March 2, 1992, at A3. *See also, Chronology of Bosnia War,* N.Y. Times, February 6, 1994, at Section 1, page 12; Doe Mem. at 3 (presenting a somewhat different chronology of events).

3. *See* Chuck Sudetic, *Belgrade Issues Warning to Bosnian Serbs,* N.Y. Times, August 3, 1994, at A10. (stating that "[t]he Srpska Republic is the government proclaimed by the Bosnian Serb rebels")

4. Doe's claim for "war crimes and crimes against humanity" shall be referred to hereafter as "war crimes".

Plaintiffs allege that these and other acts were conducted pursuant to the order and direction of defendant Karadzic, and that such acts continue to the present.

On February 11, 1993, the same day the Doe Complaint was filed, Jonathan Soroko ("Soroko") attempted to effect service on Karadzic in the lobby of Karadzic's hotel, the Hotel Inter–Continental, 111 East 48th Street, New York, New York. Affidavit of Jonathan Soroko, submitted in support of Doe Mem., sworn to on February 12, 1993 ("Soroko Aff."), at ¶ 4. At the time, Karadzic was surrounded by a security detachment led by Special Agent R.A. Diebler ("Diebler"), a Special Agent of the Diplomatic Security Service of the United States Department of State. When Soroko attempted to serve Karadzic, Diebler's security team executed a procedure designed to cover and evacuate Karadzic, forming a ring around Karadzic and rushing him into the elevator. Affidavit of Agent Roy Anthony Diebler, sworn to on September 30, 1993, ("Diebler Aff.") at ¶¶ 10–12.[5] The record contains conflicting affidavits regarding the attempted service. Soroko contends that he was no more than two feet from defendant, Soroko Aff. at ¶ 4, while Diebler contends that "the man [Soroko] could not have gotten any closer to Dr. Karadzic than 6–8 feet at the most." Diebler Aff. at ¶ 13. It is not disputed, however, that during the attempted service, Soroko called out words declaring that defendant was served. Soroko Aff. at ¶ 4; Diebler Aff. at ¶ 12. Diebler asserts that prior to leaving the United States, Karadzic had no knowledge that Soroko was attempting to serve him with process. Diebler Aff. at 14.

On March 2, 1993, K. Plaintiffs filed their related complaint, alleging tortious conduct, including, *inter alia*, rape, forced prostitution, forced pregnancy, forced childbirth, and gender and ethnic discrimination. On March 4, 1994, after attempts by professional process servers proved unsuccessful, *see* K. Mem. at 2, *see also*, Deibler Aff. at ¶ 17, the Honorable Richard Owen, United States District Judge, Southern District of New York, granted a motion for leave to effect service upon defendant by alternate means. On March 5, 1993, a copy of the summons and complaint was delivered by a United States Marshal to Special Agent Diebler, who personally delivered them that day to Karadzic. *See* K. Mem. at 2–3; Deibler Aff. at ¶ 18. On May 10, 1993, Karadzic filed the instant motion to dismiss.

## DISCUSSION

### I. *Karadzic's Motion to Dismiss*

#### A. INITIAL CONSIDERATIONS

■ As an initial matter, this Court notes that "federal judicial power is limited to those disputes ... which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). It is well settled that no justiciable controversy is presented when the parties seek an advisory opinion. *Id.* at 95, 88 S.Ct. at 1949–50. Furthermore, "a judicial declaration subject to discretionary suspension by another branch of government may easily be characterized as an advisory opinion." Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* at § 3529.1 (1984) (citations omitted).

■ Given that Karadzic's present lack of head-of-state immunity is conditioned upon a

---

**5.** Agent Diebler states in his sworn declaration the following:

> As we reached the middle of the lobby [in the hotel] the man [Soroko] got out of his chair and moved quickly toward our formation. One of the agents sounded an alarm and we immediately "covered and evacuated." This is standard procedure. The agents closed the formation around Dr. Karadzic, got his head down, I held him physically and moved as quickly as possible to the waiting elevator. The man came right at me and I believe I was the first to physically touch him. As he approached he reached into his jacket and re-

> moved what I was told later turned out to be papers. I batted his hand away. After I batted his hand away, he was stopped and questioned by two of my agents.... The man shouted words to the effect "You've been served. You've been served." By that time Dr. Karadzic and the agents evacuating him, including me, were about 30 feet away and ready to enter the elevator.

Diebler Aff. at ¶¶ 12–13. After he attempted service, Soroko was questioned by agents, and informed them that he was attempting to serve process on Karadzic.

decision of the Executive Branch not to recognize a Bosnian–Serb nation and not to acknowledge Karadzic as an official head-of-state,[6] plaintiffs' claims for relief could potentially become a request for an advisory opinion if the State Department were to declare defendant a Head of State. "A head-of-state recognized by the United States government is absolutely immune from personal jurisdiction in United States courts." *Lafontant v. Aristide,* 844 F.Supp. 128, 131 (E.D.N.Y. 1994) (Weinstein, J.). As the *Aristide* court held, the "[d]etermination of who qualifies as a head-of-state is made by the Executive Branch, it is not a factual issue to be determined by the courts. No judicial hearing or factual determination aside from receipt of the State Department's communication is warranted." *Lafontant v. Aristide,* 844 F.Supp. at 130. In *Aristide,* after the State Department submitted a letter, filed with the Court by the Justice Department pursuant to 28 U.S.C. § 517, the court promptly entered a final judgment, quashing service of process on defendant and dismissing the action. *Id.* (collecting cases in which absolute immunity was accorded a head-of-state). *See In Re Doe,* 860 F.2d 40, 44–46 (2d Cir.1988). Were the Executive Branch to declare defendant a head-of-state, this Court would be stripped of jurisdiction. *See Lafontant v. Aristide,* 844 F.Supp. at 130.[7] This consideration, while not dispositive at this point in the litigation, militates against this Court exercising jurisdiction over the instant action.

## B. SUBJECT MATTER JURISDICTION

Plaintiffs bring these related actions pursuant to the Alien Tort Claim Act; the Torture Victim Protection Act ("TVPA"); federal question jurisdiction; and the principles of supplemental jurisdiction. Doe Plaintiffs suggest in their memorandum submitted in opposition, that this Court should not address the issue of subject matter jurisdiction because defendant, who moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), did not brief the issue. Doe Mem. at 3 n. 2. Nevertheless, "[i]t is common ground that in our federal system of limited jurisdiction any party or the Court *sua sponte,* at any stage in the proceedings, may raise the question of whether the court has subject matter jurisdiction." *United Food & Commercial Workers Union v. Centermark Props. Meriden,* 30 F.3d 298, 301 (2d Cir.1994) (citation omitted). Accordingly, this Court must address the issue of subject matter jurisdiction.

### 1. This Court Does Not Have Jurisdiction Pursuant to the Alien Tort Claim Act

■ The Alien Tort Claim Act, 28 U.S.C. § 1350, grants the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Since plaintiffs do not contend that their claim arises under a treaty of the United States, this Court, in order to determine whether it has subject matter jurisdiction pursuant to § 1350, must examine whether the actions of defendant, alleged herein, constitute an actionable violation of the law of nations under the statute.

■ The Second Circuit has found that only conduct which rises to the level of an

---

6. *See* Affidavit of Martha F. Davis submitted in Opposition to Defendant's motion to Dismiss ("Davis Aff.") at Exhibit C (letter from Michael J. Habib, Director of Eastern European Affairs, U.S. Department of State, discussing the Department of State's refusal to extend immunity to Radovan Karadzic during his visits to the United Nations).

7. "[I]n *Saltany v. Reagan,* 702 F.Supp. 319, 320 (D.D.C.1988), residents of Libya brought suit against Prime Minister Margaret Thatcher of the United Kingdom, for alleged violations of international law. Pursuant to 28 U.S.C. § 517 the State Department submitted an immunity letter, suggesting that the court grant Prime Minister Thatcher immunity as the head of government of a friendly foreign state. The court accepted the State Department's suggestion as conclusive, and granted immunity." *Lafontant v. Aristide,* 844 F.Supp. at 132. *See* Restatement (Second) of Foreign Relations Law of the United States (1962) § 66 (head-of-state can be either the head-of-state or head of government).

*See generally* Roger Cohen, *Washington Might Recognize a Bosnian Serb State,* N.Y. Times, March 13, 1994, at A10. (stating that as President of his nation, Karadzic may qualify as "an organ of a foreign state or political subdivision thereof" under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603(b)(2), and therefore be immune from suit).

"international common law tort" by violating universally accepted standards of human rights is within the law of nations, and thus within the subject matter jurisdiction of the Act. *Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2d Cir.1980). In *Filartiga,* the Second Circuit consulted modern sources of international law including judicial decisions and scholarly works, in order to determine what constituted the law of nations. *Id.* at 880–81 (citing *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)).[8]

Historically, the "traditional view of international law [was] that it establish[ed] substantive principles for determining whether one country had wronged another." *Banco National de Cuba v. Sabbatino,* 376 U.S. 398, 422, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). "Classical international law was predominantly statist. The law of nations traditionally was defined as 'the body of rules and principles of action which are binding *upon civilized states* in their relation to one another.'" *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 792 n. 22 (D.C.Cir.1984) (Edwards, J.) (quoting J. Brierly, *The Law of Nations* 287 at 1 (6th ed. 1963)) (emphasis in original). *Accord Carmichael v. United Technologies Corp.,* 835 F.2d 109, 113 (5th Cir.1988) ("The standards by which nations regulate their dealings with one another *inter se* constitute the 'law of nations.' These standards include the rules of conduct which govern the affairs of this nation, acting in its national capacity, in relationships with other nations.") (citations omitted). Over time, the view that international law applied only as between nations evolved, such that international law became applicable to nations acting against their own citizens or to a foreign government acting against an individual. *See Filartiga,* 630 F.2d at 884–85.

In *Filartiga,* the Second Circuit held that official torture constituted an actionable claim within the subject matter jurisdiction of the court under § 1350. In reaching this conclusion the Second Circuit stated that "[t]orture ... is defined as any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a *public official.*" *Id.* at 882 (citing General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N. Doc A/1034 (1975)) (emphasis added). The *Filartiga* Court went on to hold that acts of official torture committed by a government either against aliens, or against nationals of the acting state, violate the law of nations. *Filartiga,* 630 F.2d at 884–85. The Second Circuit, in *Filartiga,* reached the conclusion that "*official torture* is now prohibited by the law of nations." *Id.* at 885 (emphasis added).

Since *Filartiga,* § 1350 has been applied by a handful of federal courts, and the decisions reviewed by this Court reinforce the conclusion that acts committed by non-state actors do not violate the law of nations. Most notable, perhaps, is the opinion by the United States Court of Appeals for the District of Columbia in *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984). In *Tel–Oren,* survivors and representatives of persons murdered by the Palestine Liberation Organization ("PLO") brought suit pursuant to 28 U.S.C. §§ 1350 and 1331. The District Court dismissed the action for lack of subject matter jurisdiction. The District of Columbia Circuit panel, writing three separate concurring opinions, affirmed the district court's dismissal. In his opinion, Judge Edwards embraced the holding of *Filartiga,* but specifically declined to extend *Filartiga* or the application of § 1350 to non-state actors.[9] Judge Edwards stated that "[t]he ex-

---

**8.** Beginning with *Filartiga,* courts have recognized a wide range of international common law torts, which, when committed under the color of state law, have been held to be actionable under the Alien Tort Act, including, *inter alia,* torture, slave trade, and piracy, *Filartiga,* 630 F.2d at 890; genocide and cruel, inhuman or degrading treatment, *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984) (Edwards, J. concurring); summary execution, *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1541–42 (N.D.Cal. 1987) ("official torture constitutes a cognizable violation of the law of nations"); wrongful death,

*Linder v. Portocarrero,* 963 F.2d 332, 336 (11th Cir.1992); and war crimes. *See also Demjanjuk v. Petrovsky,* 776 F.2d 571, 582 (6th Cir.1985) (holding war crimes to be universally recognized violations of international law, but not specifically considering the Alien Tort Act), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). *See also* Louis Henkin, *The Age of Rights* 75–76 (1990).

**9.** Judge Bork found that § 1350 did not provide a cause of action, and Judge Robb concluded

tension would require this court to venture out of the comfortable realm of established international law—within which *Filartiga* firmly sat—in which states are the actors. It would require an assessment of the extent to which international law imposes not only rights but also obligations on individuals." *Tel–Oren*, 726 F.2d at 792. Judge Edwards also stated that the law of nations does not impose "the same responsibility or liability on non-state actors [ ] as it does on states and persons acting under color of state law." *Id.* at 776. Judge Edwards concluded that since "the PLO is not a recognized member of the community of nations" an action brought pursuant to § 1350 would not lie. *Id.* at 792. Accordingly, Judge Edwards "decline[d] to read section 1350 to cover non-state actors, absent guidance from the Supreme Court on the statute's usage of the term 'law of nations.' " *Id.* at 795.[10]

Since *Tel–Oren*, a number of Federal Courts have applied § 1350, but, in doing so, have also declined to extend it to cover the conduct of non-state actors. In *Sanchez–Espinoza v. Reagan*, 770 F.2d 202 (D.C.Cir. 1985), a group of Nicaraguans brought a claim pursuant to § 1350, seeking redress for tortious injuries which they and their families suffered at the hands of the Nicaraguan Contra Forces ("Contras"). *Id.* at 205. Plaintiffs' claims arose out of alleged attacks by the Contras on Nicaraguan civilians which resulted in, *inter alia*, summary execution, murder, abduction, torture, rape, and woundings. *Id.* In holding that plaintiffs' claims could not be remedied under the Alien Tort Statute, Judge (now Justice) Scalia stated the following:

> "[w]e are aware of no treaty that purports to make the activities at issue here unlawful when conducted by private individuals. As for the law of nations—so-called 'customary international law,' arising from 'the

customs and usages of civilized nations,'— we conclude that this also does not reach private, non-state conduct of this sort." *Id.* at 206–07 (citations omitted). Accordingly, the District of Columbia Circuit dismissed the claims brought pursuant to § 1350. *Id.* See also *Linder v. Calero Portocarrero*, 747 F.Supp. 1452, 1462, 1469 n. 8 (S.D.Fla.1990) (stating "[t]he contras are private individuals whose actions simply do not represent state action," and that "[t]he Contras have not been recognized as the legitimate government of Nicaragua by the United States").

In *Carmichael v. United Technologies Corp.*, 835 F.2d 109, 113 (5th Cir.1988), the Fifth Circuit, while not deciding the issue, opined "that the Alien Tort Statute does not confer subject matter jurisdiction over private parties who conspire in or aid and abet, official acts of torture." [11] *Id.* at 113–14. In *Forti v. Suarez–Mason*, 672 F.Supp. 1531 (N.D.Cal.1987), the district court echoed Justice Scalia's sentiments when it stated: "[o]f course, purely private torture will not normally implicate the law of nations, since there is currently no international consensus regarding torture practiced by non-state actors." *Id.* at 1541.

Courts that have found causes of action to lie pursuant to § 1350, have done so when state actors violated the law of nations. *See e.g., Filartiga*, 630 F.2d at 880 (Paraguayan state official); *In Re Estate of Ferdinand E. Marcos Litigation*, 978 F.2d 493 (9th Cir. 1992) (defendant controlled military police and acted under martial law declared by then-President Marcos); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir.1992) (Argentine military officials); *Forti v. Suarez–Mason*, 672 F.Supp. 1531 (N.D.Cal.1987) (former Argentine General).

This Court finds that the acts alleged in the instant action, while grossly repugnant,

that the case presented a nonjusticiable "political question."

**10.** It should be noted that causes of action have been brought against the PLO with Federal Courts basing their jurisdiction on other grounds. In *Klinghoffer v. S.N.C. Achille Lauro*, 739 F.Supp. 854 (S.D.N.Y.1990) jurisdiction was based on admiralty, pursuant to 28 U.S.C. § 1333, and in *United States v. Palestine Libera-*

*tion Organization*, 695 F.Supp. 1456 (S.D.N.Y. 1988) the cause of action was brought pursuant to the Anti-terrorism Act, 22 U.S.C. §§ 5201–5203.

**11.** The Fifth Circuit defined "official torture" as torture by *officials* shown to be *officially condoned* by the nation. *Id.* at 114. (emphasis added).

cannot be remedied through 28 U.S.C. § 1350. The current Bosnian–Serb warring military faction does not constitute a recognized state any more than did the PLO, as it existed at the time that the District of Columbia Circuit decided *Tel–Oren*, or than did the Nicaraguan Contras at the time Justice Scalia decided *Sanchez–Espinoza*.[12] Accordingly, this Court finds that the members of Karadzic's faction do not act under the color of any recognized state law. *See, e.g., Sanchez–Espinoza v. Reagan*, 770 F.2d at 202; *Tel–Oren* 726 F.2d at 791; *Linder v. Calero Portocarrero*, 747 F.Supp. 1452, 1462 (S.D.Fla.1990) ("[t]he contras are private individuals whose actions simply do not represent state action").

The situation in the former Yugoslavia is such that the present military factions are less stable and less identifiable than was the PLO at the time of *Tel–Oren*. The Bosnian–Serbs have achieved neither the level of organization nor the recognition that was attained by the PLO, as manifested by the PLO's achieving the position of a permanent observer at the U.N.[13] Based on the teaching of the aforementioned case authorities, it follows that plaintiffs cannot contend that the acts allegedly being conducted are either official torture or state initiated. *See Tel–Oren*, 726 F.2d at 791. This Court declines to extend § 1350 to redress acts of torture engaged in by private individuals.

### 2. This Court Does Not Have Jurisdiction Pursuant to the Torture Victim Protection Act

■ Plaintiffs also advance the position that this Court has subject matter jurisdiction based on the Torture Victim Protection Act ("TVPA"). *See* Torture Victim Protection Act of 1991, Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350). The TVPA provides an express private right

of action against "an individual who, under actual or apparent authority, or color of law, of any foreign nation" subjects another individual to torture or extrajudicial killing. *Id.* The TVPA was enacted to codify the private right of action against official torture set forth in *Filartiga. LaFontant v. Aristide*, 844 F.Supp. at 138 ("[t]he TVPA codifies the holding in *Filartiga v. Pena–Irala* ") (Weinstein, J.). *See H.R.Rep. No. 367*, 102nd Cong., 2nd Sess. 3–4 (1991) ("House Report"), reprinted in 1992 U.S.C.C.A.N. 84, 85–86; *S.Rep. No. 249*, 102nd Cong., 2nd Sess. 3–7 (1991) ("Senate Report").

The TVPA, a relatively new statute, passed in 1992, has been construed by only a few Federal Courts. This Court, having looked to the language of the statute and to the legislative history, concludes that both the language and legislative history clearly indicate that the statute only extends to actions carried out under the authority or color of law of an entity recognized by the United States as a foreign nation.

On its face the TVPA gives federal courts jurisdiction over suits against foreign officials who kill illegally on foreign territory. It provides in part:

Sec. 2. (a) Liability.—An individual who, under actual or apparent authority, or color of law, *of any foreign nation*—(1) subjects an individual to torture shall, in a civil action, be liable for damages ... or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages....

(b) Exhaustion of remedies.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

---

12. The Second Circuit has limited the definition of 'state' to "entities that have a defined and a permanent population, that are under the control of their own government, and that engage in or have the capacity to engage in, formal relations with other such entities." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 47 (2d Cir.1991) (quotations, brackets and citation omitted). The current Bosnia–Serb entity fails to meet this definition.

13. The PLO was granted permanent observer status at the United Nations in 1974, and "[s]ince 1974, the PLO has continued to function without interruption as a permanent observer and has maintained its mission to the U.N. without trammel." *United States v. PLO*, 695 F.Supp. at 1459.

28 U.S.C. § 1350 note (1992) (emphasis added). As the House Report on the bill explains:

> [t]he phrase 'under actual or apparent authority, or color of law' makes clear that the plaintiff must establish some governmental involvement in the torture or killing to prove a claim.... The bill does not attempt to deal with torture or killing by purely private groups.

House Report at 5, U.S.C.C.A.N. 1992, p. 87. Similarly, the Senate Report states the following:

> [t]his legislation does not cover purely private criminal acts by individuals or non-governmental organizations ... the phrase 'actual or apparent authority or under color of law' is used to denote torture and extrajudicial killings committed by officials both within and outside the scope of their authority.

Senate Report 249 at 8.

Clearly, the TVPA was designed to protect individuals from acts taken by foreign government officials or foreign governments. On its face, the TVPA requires a plaintiff's claim for relief to be based on actions taken under color of law *of any foreign nation.* The legislative history reflects the same reading. This reading of the TVPA is entirely consistent with and, indeed, supports this Court's holding with respect to the Alien Tort Claim act, *supra,* since the TVPA was also codified at § 1350.

Both the Senate and House Reports state that courts should look to principles of liability under 42 U.S.C. § 1983 in construing the "color of law" phrase in the TVPA. *See* Senate Report at 8; House Report at 5. A plaintiff can only meet the requirements of § 1983 to establish that a defendant has acted "under color of state law" if he alleges sufficient "state action" to make out a constitutional violation. The conduct of the defendant must be somehow chargeable to the state in question. *See, e.g., Dwares v. City of New York,* 985 F.2d 94, 97 (2d Cir.1993) ("it is well established that in order to state a claim under § 1983, a plaintiff must allege that the challenged conduct was attributable at least in part to a person acting under color of state law."); *Merola v. Nat'l R.R. Passenger Corp.,* 683 F.Supp. 935, 940 (S.D.N.Y. 1988).

■ As discussed above, Karadzic does not act with the authority of any foreign nation. In fact, K. Plaintiffs' moving papers describe Karadzic as "neither a head of state nor a diplomat of a recognized state." K. Mem. at 5. K. plaintiffs further acknowledge that "Karadzic is not an official of any government." K. Mem. at 21 n. 25. Accordingly, finding that the acts attributed to defendant are those of private individuals, similar to those of the Contras, and finding that the TVPA clearly was enacted to redress acts of torture by governments or government officials, plaintiffs' cause of action against defendant based on the TVPA cannot lie.[14]

### 3. This Court Does Not Have Jurisdiction Pursuant to an Implied Right of Action under § 1331

■ Plaintiffs also bring their causes of action under 28 U.S.C. § 1331, subject matter jurisdiction arising under a federal question. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

■ It has been recognized in this Circuit that substantive international law is incorporated into the law of the United States. *See Filartiga,* 630 F.2d 876, 887 (2d Cir.1980). As discussed above, jurisdiction in this action cannot lie based on the express causes of action set forth by Congress in the TVPA or

---

**14.** Additionally, the Court notes that section 2 of the TVPA clearly requires litigants to exhaust the adequate and available remedies in the location of the tort. On the present record before this Court, there is insufficient evidence addressing whether plaintiffs have attempted to seek remedies in the place in which the conduct giving rise to the claim occurred, nor is there sufficient evidence shedding light on the issue of whether, given the present situation in former Yugoslavia, such remedies are available or would be adequate. *See* Amicus Curiae Memorandum Submitted in Opposition to Defendant's Motion by the International Human Rights Law Group, dated August 27, 1993 ("IHR Amicus"), at 26, (noting "two criminal cases were recently brought in Sarajevo and resulted in death sentences").

the Alien Tort Claim Act. Accordingly, the only other jurisdictional grounds for Plaintiffs to assert in this matter would be to base their claims on an implied right of action arising out of the law of nations. As Judge Edwards stated in *Tel–Oren* 726 F.2d at 779–80 n. 4., "the language of § 1331, unlike § 1350, suggests that plaintiffs must identify a remedy granted by the law of nations or argue successfully for one to be implied."

This Court declines to find an implied right of action arising under the law of nations, specifically in view of the fact that Congress has addressed the matter and created two express causes of action in the form of the Alien Tort Claim Act and the TVPA, codified at § 1350. Presumably, Congress did not lack power to confer subject-matter jurisdiction over such an action, but declined to do so. *See* Senate Report at 5–6. *See also Sugrue v. Derwinski,* 26 F.3d 8, 12 (2d Cir. 1994) (declining to find a new private right of action, and stating that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation"). As Judge Kearse stated in *Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 429 (2d Cir.1987) (Kearse, J. dissenting), *rev'd on other grounds,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), "though substantive international law is part of the common law of the United States ... federal court subject-matter jurisdiction is not a matter of common law. Such jurisdiction exists only to the extent that Congress has bestowed it, in the exact degree and character which to Congress may seem proper for the public good." *Id.* (citations and quotations omitted).

Further, as discussed above, "the law of nations provides no substantive right to be free from the private acts of individuals." *See Tel–Oren,* 726 F.2d at 779–80 n. 4; *In Re Estate of Ferdinand E. Marcos,* 978 F.2d 493, 501 (9th Cir.1992) ("[o]nly individuals who have acted under official authority or

under color of such authority may violate international law"). Since private acts of individuals do not violate the law of nations, even assuming *arguendo,* that this Court were willing to attempt to find an implied cause of action, which it is not, this Court is doubtful that one could be implied as to the defendant because the acts attributed to him were performed in a private capacity. Accordingly, those allegedly harmed by the acts of defendant cannot assert an implied right of action arising from the law of nations and § 1331. *See Tel–Oren,* 726 F.2d at 779–80 n. 4.

Absent a clear statute from Congress, or direction from higher Courts, this Court finds that actions based only on § 1331 without an express right of action granted by Congress, must be dismissed for lack of subject-matter jurisdiction.

## II. Plaintiffs' State Law Claims

In general, "a district court may exercise supplemental jurisdiction over pendent state claims when it has jurisdiction over associated federal claims that 'form part of the same case or controversy.' " *Sriram v. Preferred Income Fund,* 22 F.3d 498, 501 (2d Cir.1994) (quoting 28 U.S.C. § 1367).[15] *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966). As the Second Circuit has recently reiterated, a district court's exercise of supplemental jurisdiction is within its discretion. *Vally Disposal, Inc. v. Central Vermont Solid Waste Management District,* 31 F.3d 89, 103 (2d Cir.1994) (citing *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir.1993) ("The decision whether to exercise pendent jurisdiction is within the discretion of the district court.")). *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994) ("Just as with the prior law of pendent jurisdiction, the exercise of supple-

---

**15.** 28 U.S.C. § 1367, enacted Dec. 1, 1990, codified the law with regard to pendent party, pendent claim, and ancillary jurisdiction by granting federal district courts "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution." *Id.* The statute abandons the old labels of pendent and ancillary jurisdiction, but preserves the principles established under the doctrines, referring to all such jurisdiction as "supplemental." *See* Denis F. McLaughlin, *The Federal Supplemental Jurisdiction Statute—A Constitutional & Statutory Analysis,* 24 Ariz.St. L.J. 849 (1992).

mental jurisdiction is left to the discretion of the district court.").

Having dismissed plaintiffs' federal claims, plaintiffs' state claims also should be dismissed for lack of jurisdiction. In general, in order to invoke supplemental jurisdiction, there must be an underlying cognizable federal claim. In this case, plaintiffs' federal claims have been dismissed. When the district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). " '[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.' " *Morse v. University of Vermont,* 973 F.2d 122, 127 (2d Cir.1992) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988)). *See Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 (holding that the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits). Thus, this Court declines to assert supplemental jurisdiction over plaintiffs' state claims. Accordingly, plaintiffs' state-law claims are hereby dismissed.

## CONCLUSION

For the foregoing reasons, this Court hereby grants Karadzic's motion to dismiss for lack of subject-matter jurisdiction. Accordingly, plaintiffs' claims are hereby dismissed in their entirety.

**SO ORDERED.**